IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLAN A. MYERS, LP,<br>a Pennsylvania corporation | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. _____ |
| v. | ) ) | |
| NEW CASTLE COUNTY, a political<br>subdivision of the State of Delaware, | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiff, Allan A. Myers, LP ("AAM"), by and through its undersigned counsel, hereby submits the foregoing Complaint stating as follows:

## PARTIES

1.      Plaintiff AAM is a Pennsylvania corporation registered to do business in the State of Delaware, having its principal place of business located at 1805 Berks Road, Worcester, PA 19490.

2.      Defendant New Castle County ("NCC") is a political subdivision of the State of Delaware with its principal office located at the New Castle County Government Center, 87 Reads Way, New Castle, Delaware 19720.

## JURISDICTION AND VENUE

3.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

4.      The venue is proper in this judicial district under 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to this cause of action occurred within this jurisdictional district.

5.      The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.  Therefore, venue is proper in this Court and the Court has jurisdiction over this matter.

## FACTUAL BACKGROUND

6.      Defendant NCC is responsible for maintaining the Governor Printz Interceptor (the "Interceptor"), a large sewer line, which runs along Governor Printz Boulevard, north of the Wilmington, Delaware city limits (within the Stoney Creek Pump Station) and just west of Interstate 495, between Bellevue Avenue and Winding Lane.

7.      The Interceptor was built in the 1940s through 1970s.  The aging system experienced extremely high rainfall-induced inflow and infiltration and had structural defects which caused the system to overflow into the Delaware River during rainfall events.

8.      In 2002, the Department of Natural Resources and Environmental Control ("DNRC") and NCC developed a Secretary's Order to facilitate a timely and cost effective solution to problems within the sewer system.  NCC committed to rehabilitate the system and eliminate regular overflows. This Order was signed on October 7, 2003. The Interceptor is part of the NCC's Combined Sewer Overflow ("CSO") Elimination Plan.

9.      In the Spring of 2010, NCC undertook the Governor Printz Interceptor – Section I Construction Project (Number 220612) to replace the deteriorating sanitary sewer Interceptor (the "Project").

10.     NCC retained Parsons Brinckerhoff, Inc. (PB America, Inc.) ("PB") to perform design and engineering services for the Project.

11.     Upon information and belief, PB has remained an agent and representative of NCC throughout the course of the Project.

12.     The Project was bid on May 25, 2010.

13.     AAM was provided with a notice of intent to award dated June 14, 2010.

14.     AAM signed and returned the construction contract entitled Contract No. 2010-01, Bid #10-1012 (the "Contract") on June 30, 2010.

15.     However, NCC did not immediately execute and return the Contract.

16.     On or about September 7, 2010, NCC finally executed the Contract.

17.     Pursuant to the Contract, AAM agreed to perform, among other things, the following work: install ten thousand three hundred (10,300) linear feet of parallel gravity sanitary sewer interceptors with large diameters within the same trench and thirty-five (35) manholes (the "Work"). A true and correct copy of the first page of the Contract, the whole Contract being too voluminous to attach, is attached hereto as Exhibit "A" and is incorporated herein by reference.

18.     Several documents, together with the Contract itself, constitute the Contract documents. These Contract documents include, *inter alia*: the Contract, including all Change Orders and Written Amendments; Addenda; Special Provisions; Drawing Set; Supplemental Specifications; NCC Department of Public Works Standard Specifications for Construction; and Delaware Department of Transportation ("DelDOT") Standard Specifications (the "Contract Documents"). AAM refers to and incorporates these Contract Documents as if set forth at length

herein.  Because of their voluminous nature, the Contract Documents are not attached to this Complaint.

19.     Pursuant to the Contract, NCC agreed to pay AAM the sum of Fifteen Million Ninety Thousand Dollars ($15,090,000.00) for the performance of the Work.

20.     The Contract required AAM to complete all of the work on the Project within four hundred twenty-five (425) calendar days from the day AAM started the Work or at the expiration of ten (10) days after AAM's receipt of the Notice to Proceed.

21.     AAM received the Notice to Proceed ("NTP") from NCC dated September 1, 2010 on September 8, 2010.  NCC's general practice is to have the Contract time to commence on the eleventh (11th) day after receipt of the NTP or the day construction actually starts, whichever is earlier.  However, the NTP stated that the Contract time would not start until after the preconstruction meeting to be scheduled in the near future.

22.     The preconstruction conference occurred on October 29, 2010.

23.     As directed by NCC, AAM commenced its Work on the Project on or about December 1, 2010.

24.     Accordingly, the Project was to be completed within four hundred and twenty-five (425) calendar days or on or before January 29, 2012, subject to approved Contract time extensions.

25.     To the extent possible, AAM diligently performed and completed its Work on the Project.  However, throughout the course of the Project, AAM's Work was affected, increased and delayed due to unforeseen and differing subsurface site conditions, inclement weather conditions and events, errors and omissions in the Contract Documents prepared by NCC and PB, unjustified work stoppages at the direction of NCC and PB, and NCC's and PB's failure to

timely and reasonably respond to, and resolve, issues and conflicts which arose during the course of the Project.

26.    During the course of the Project, AAM provided formal written notice to NCC and/or PB of at least nine (9) separate claims for either additional costs, time adjustments due to delays and/or both that have gone unanswered, unresolved or baselessly denied by NCC.

27.    On April 24, 2012, counsel for AAM sent a letter to counsel for NCC demanding a conference with representatives of NCC and AAM and counsel to meet and discuss resolution of AAM's pending nine (9) claims.

28.    On May 16, 2012, representatives of AAM and NCC and counsel met but were unable to resolve AAM's pending claims.

29.    AAM now files the present action in order to recover money damages and an extension to the Contract time for the aforementioned claims.

30.    Specifically, AAM's present claims are for additional work and/or costs regarding: (1) discovery of arsenic in the Work area; (2) inclement weather - impacts resulting from Hurricane Irene; (3) inclement weather – impacts resulting from heavy rains experienced during the months of August and September; (4) the Delmarva electric outage; (5) unanticipated revisions to AAM's Excavation Plan at the direction of NCC; (6) the need for backfill to replace the unsuitable material encountered in the Work area; (7) the NCC-directed work shutdown from November 2011 to April 2012; (8) the unanticipated NCC-directed changes to AAM's rock blasting; and (9) The NCC-directed shutdown on April 11, 2012 (collectively referred to hereafter as "Additional Work").

A.     **Claims For Additional Costs And/Or Time Extension**

1.     **Discovery of Arsenic in Work Area**

31.     Between May 3, 2011 and June 13, 2011 (42 days), AAM was forced to cease work on the seventy-two inch (72") pipe due to the discovery of arsenic at the Project.

32.     During the shutdown period, AAM conducted water and soil testing to determine the limits of contamination, explored possible disposal locations and addressed whatever other remedial measures where necessary to allow AAM's work to continue.

33.     To assist in the remedial efforts and allow for the Work to continue, on June 7, 2011, NCC directed AAM to commence work on force account ("Force Account Work").

34.     This Force Account Work included the installation of the seventy-two inch (72") pipe through the contaminated area, proper disposal of contaminated earth, stone backfill, and all required "HASP" consulting, training, monitoring, and soil/waste testing.

35.     Per NCC's direction, AAM commenced its Work once again, forty-two (42) days later, on June 13, 2011, while also performing the Force Account Work.

36.     On June 27, 2011, test results were received that verified the soil was back to normal levels and, therefore, the Force Account Work was complete.  Due to performance of the Force Account Work, between June 13, 2011 and June 27, 2011, AAM's Work was further delayed by at least fifty percent (50%).

37.     Therefore, the total delay/extra work experienced for the discovery of arsenic was forty-two (42) days (5/3-6/13), plus seven (7) days (6/13-6/27, 14 days @ 50%) for a total of forty-nine 49 days.

38.     On October 28, 2011, AAM requested a compensable time extension of **forty-nine (49) calendar days** in the amount of **One Hundred Eighty-Seven Thousand Five**

Hundred Forty-Six Dollars and Three Cents ($187,546.03).   Additionally, AAM submitted a claim for its ninetten (19) days of equipment standby costs of **Ninety-Nine Thousand Three Hundred Thirty-Seven Dollars and Seventy-Eight Cents ($99,337.78)**.   A copy of AAM's notice letter is attached hereto as Exhibit "B" and is incorporated herein by reference.

39.     AAM also submitted its costs associated with the above referenced Force Account work.   Following a conference on March 20, 2012 with NCC and PB officials, AAM resubmitted its Force Account costs in the amount of **One Hundred Nine Thousand Three Hundred Seventy-Six Dollars and Twenty-Two Cents ($109,376.22)**.   A copy of AAM's March 29, 2012 letter is attached hereto as Exhibit "C" and is incorporated herein by reference.

40.     To date, despite repeated demands, NCC has failed to make payment to AAM for the associated claim for time delay or Force Account work due the arsenic encountered at the Project which totals **Three Hundred Ninety-Six Thousand Two Hundred Sixty Dollars and Three Cents ($396,260.03) and request for time extension of forty-nine (49) days**.

## 2.     Weather Impacts Resulting From Hurricane Irene

41.     On August 26, 2011, AAM was directed to remove Project signs, barrels and E&S controls due to the impending Hurricane Irene.

42.     These work activities and this emergency weather event resulted in a delay to AAM's work of four (4) days.

43.     On August 30, 2011, AAM submitted its costs associated with the preparatory work prior to Hurricane Irene and the work required following the storm on August 29, 2011 in the amount of Ten Thousand Nine Hundred Thirteen Dollars and Eight Cents ($10,913.08).   A copy of AAM's notice letter is attached hereto as Exhibit "D" and is incorporated herein by reference.

44.     To date, despite repeated demands, NCC has failed to make payment to AAM for the costs and time impact associated with this work in the amount of **Ten Thousand Nine Hundred Thirteen Dollars and Eight Cents ($10,913.08)** and request for time extension of **four (4) days.**

### 3.     Weather Impacts Resulting From Heavy Rains In August And September 2011

45.     During the months of August and September 2011, the Project experienced unprecedented/extreme amounts of rainfall.

46.     The Project recorded twenty (20) inches of rain in August and three (3) inches of rain in September.

47.     Historically, August and September rainfall is three (3) to four (4) inches per month.

48.     This record-breaking rainfall impacted the Project and AAM's work operations.

49.     These circumstances were outside AAM's control and, therefore, AAM requested a Contract Time Extension of thirteen (13) days due to rain and Project flooding.

50.     These days include days spent cleaning up following heavy rains, and those days AAM's operations were impacted due to heavy rain.  A copy of AAM's notice letter dated October 7, 2011 is attached hereto as Exhibit "E" and is incorporated herein by reference.

51.     To date, despite repeated demands, NCC has failed to grant AAM a time extension of **thirteen (13) days** for the weather-impacted days during August and September.

### 4.     Delmarva Electric Outage

52.     On January 13, 2012, Delmarva informed AAM that all work occurring near the overhead primary lines must be greater then twenty (20) feet from their electric lines pursuant to

changes to OSHA Regulations for Proximity that took effect in August 2010, subsequent to AAM's bid dated May 25, 2010.

53.     As a result, AAM investigated the new OSHA Standard and advised PB and/or NCC that, according to the new standards, any work occurring closer than the new twenty (20) foot rule would require numerous additional safety requirements as specified within the OSHA regulations, and these additional measures must be approved by the affected utility company.

54.     Accordingly, AAM met with Delmarva's Engineering, Field Operations, and Safety Manager, who advised AAM that power outages were required to complete the remaining twin sewer work that parallels the overhead electric primary power.

55.     As a result of this changed condition, AAM incurred both time and cost impacts in the amount of **One Hundred Sixty-Six Thousand Six Hundred Sixty Dollars ($166,660.00)**. These costs include **fifteen (15) days** of delay costs incurred by AAM and the added Traffic Control cost for this delay.  A copy of AAM's notice letter dated February 16, 2012 is attached hereto as Exhibit "F" and is incorporated herein by reference.

56.     On March 13, 2012, AAM sent a second notice letter to PB and/or NCC, advising them that the fifteen (15) days of delay had been used up and Delmarva's work still was not complete due to a State permitting issue.  AAM requested in its letter to PB and/or NCC to assist Delmarva in expediting the needed permits to mitigate any further costs resulting from this delay related to the issuance of the Permit.  A copy of AAM's March 13, 2012 letter is attached hereto as Exhibit "G" and is incorporated herein by reference.

57.     To date, despite repeated demands, NCC has failed to make payment to AAM for the costs and time impact associated with this work in excess of **One Hundred Sixty Six**

**Thousand Six Hundred Sixty Dollars ($166,660.00)** and request for a time extension of **fifteen (15) days**.

58.     On March 14, 2012, with no basis, PB and/or NCC denied AAM's Change Order Request in its entirety.

59.     AAM responded in writing immediately that it disagreed and disputed PB and/or NCC's findings and conclusions and will be seeking equitable compensation for this disputed Change Order Request.

### 5.     Rev 2 Excavation Plan

60.     PB's November 10, 2011 and NCC's November 17, 2011 correspondence directed AAM to cease excavation adjacent to the existing gas lines due to elevated readings at the flush mount markers installed below the ground surface in the soil that exceeded the Level 2 upset threshold criteria specified for surface settlement markers to be installed on structures such as exterior walls of buildings, interior walls of underground vaults or surface features such as curbs.

61.     As such, NCC directed AAM to develop a remediation plan to ensure the flush mount markers in the soil would not exceed the Level 2 threshold of 0.5 inches.

62.     The Level 2 threshold value of 0.5 inches in Specification Section 2140, 3.11(D)(7), however, does not apply to the flush mount markers installed in the soil.

63.     The Level 2 threshold value of 0.5 inches in Specification Section 2140 only applies to markers installed on structures such as exterior walls of buildings, interior walls of underground vaults or surface features such as curbs.

64.     Accordingly, on November 23, 2011, AAM notified NCC that AAM was not responsible under the Contract to prepare and carry out a remediation plan and AAM considered

doing extra work under its Contract. A copy of AAM's November 23, 2011 letter is attached hereto as Exhibit "H" and is incorporated herein by reference. AAM provided NCC with formal notice that it would be seeking full compensation for the costs associated with changing AAM's trenching and backfilling means and methods.

65. On December 8, 2011, AAM submitted its Revision 2 Excavation and Dewatering Plan in response to PB and/or NCC's directive. A copy of the December 9, 2011 transmittal letter is attached as Exhibit "I" and is incorporated herein by reference.

66. After several months, on February 21, 2012, NCC, through PB, provided "Conditional Acceptance" of AAM's remediation plan.

67. Upon receipt of the "Conditional Acceptance" of the plan, AAM began the necessary procurement and planning activities required to implement the changes required for the Excavation & Dewatering Plan Rev 2. The biggest change was the installation of steel sheet piling in the trenches, which was not anticipated or shown on the Contract Plans or Specifications.

68. Accordingly, AAM submitted its Change Order proposal and cost breakdown in the amount of One Million Two Hundred Sixty-Three Thousand Two Hundred Ninety-Seven Dollars and Seven Cents ($1,263,297.07) for NCC's review. A copy of AAM's March 8, 2012 letter is attached hereto as Exhibit "J" and is incorporated herein by reference.

69. To date, despite repeated demands, NCC has failed to make payment to AAM for the costs associated with this work in the amount of **One Million Two Hundred Sixty Three Thousand Two Hundred Ninety-Seven Dollars and Seven Cents ($1,263,297.07)**.

70. On March 14, 2012, with no basis, NCC, through PB, denied AAM's Change Order Request in its entirety.

71.     AAM responded in writing immediately that it disagreed and disputed PB and/or NCC's findings and conclusions and would be seeking equitable compensation for this disputed Change Order Request.

### 6.     Backfill Needed To Replace Unsuitable Material Encountered

72.     In September 2011, AAM encountered unsuitable materials during the Interceptor pipe installation.

73.     AAM immediately notified NCC of the condition, as well as its concerns related to using common Type F backfill under roadway sections and the strong possibility of future problems related to this material.

74.     On September 23, 2011, AAM advised PB and/or NCC that it would track the unsuitable material encountered and submit all costs related to backfill needed to replace the unsuitable material on the Project for installation under the roadway sections. A copy of AAM's September 23, 2011 letter is attached hereto as Exhibit "K" and is incorporated herein by reference.

75.     On March 13, 2012, AAM submitted said Payment Request in the amount of Two Hundred Seven Thousand Five Hundred Eighty-Three Dollars ($207,583.00). A copy of AAM's March 13, 2012 letter is attached as Exhibit "L" and is incorporated herein by reference.

76.     To date, despite repeated demands, NCC has failed to make payment to AAM for the costs associated with the backfill material to replace the unsuitable excavated material in the amount of **Two Hundred Seven Thousand Five Hundred Eighty-Three Dollars ($207,583.00)**.

### 7.  Owner Directed Shutdown (November 2011 To April 2012)

77.  On November 10, 2011, AAM was directed to shut down the twin sewer installation work due to alleged vertical movement of the flush mount marker #210A, which exceeded the Level 2 alert designated for the surface settlement markers intended to be installed on fixed structures.

78.  Per AAM's numerous notice letters to NCC, the surface settlement markers alert criteria (which are designed to be installed on structures such as exterior walls of buildings, interior walls of underground vaults or surface features such as curbs) is not applicable to the flush mount markers at issue here which were installed below the ground surface in the dirt.

79.  Accordingly, AAM provided formal notice to NCC on three separate occasions (11/10/11, 11/23/11, & 12/9/11) that it would seek equitable compensation for all costs and delays related to the unwarranted one hundred forty-three (143) calendar day shutdown.

80.  AAM was permitted by NCC to restart the twin sewer installation work again on April 2, 2012.

81.  On or about the same day, AAM was permitted to restart this work.  AAM submitted a formal Change Order Request and back up documentation for the Project Shutdown period of one hundred forty-three (143) days from November 10, 2012 to April 1, 2012 in the amount of One Million Thirteen Thousand Six Hundred Thirty-Nine Dollars and Eight Cents ($1,013,639.08).  A copy of AAM's letter and Change Order Request is attached hereto as Exhibit "M" and is incorporated herein by reference.

82.  To date, despite repeated demands, NCC has failed to make payment to AAM for the costs associated with this work in the amount of **One Million Thirteen Thousand Six**

**Hundred Thirty-Nine Dollars and Eight Cents ($1,013,639.08)** and request for time extension of **one hundred forty-three (143) days**.

### 8.   Rock Blasting Changes

83.    AAM has incurred substantial extra costs that were never anticipated at the time of bid or represented in the Contract Documents due to changes in the micro blasting charge sizes and modifications to AAM's original blasting plan.

84.    This was mainly the result of third party Linde, LLC's concerns of damage to their pipe lines that are located within the Project Right of Way.

85.    Accordingly, on March 12, 2012, AAM submitted formal written notice to PB and/or NCC of its claim for all of its costs incurred thus far related to this change in its Work. These costs represent the difference between AAM's initial blasting submittal work plan and the revised blasting plan submittal due to the Contract change.  A copy of AAM's March 12, 2012 notice letter is attached hereto as Exhibit "N" and is incorporated herein by reference.

86.    On August 1, 2012, AAM submitted a formal Change Order Request and back-up documentation for its additional costs due to the rock blasting changes in the amount of One Million Two Hundred One Thousand Eight Hundred Seventy Dollars and Seventy-Five Cents ($1,201,870.75).  A copy of AAM's Change Order Request is attached hereto as Exhibit "O" and is incorporated herein by reference.

87.    On March 14, 2012, with no basis, PB and/or NCC denied AAM's Notice of Claim related to the Project Blasting in its entirety.

88.    AAM responded in writing immediately that it disagreed and disputed PB and/or NCC's findings and conclusions and will be seeking equitable compensation for this disputed Change Order Request.

9.    **Owner Directed Shutdown (April 11, 2012 To July 10, 2012)**

89.    On April 11, 2012, AAM performed survey elevation checks on the flush mount markers and discovered a change in elevation greater than the Level 2 upset threshold.

90.    Pursuant to PB's "conditional acceptance" letter for the Rev 2 Excavation Plan, AAM was required to stop work.

91.    AAM immediately notified PB and/or NCC of the survey information and for direction on how to proceed.

92.    Yet again, AAM reiterated to PB and/or NCC that the Project is not constructible within the instrumentation performance criteria PB has directed AAM to follow, the same performance criteria AAM had formally disputed in writing on numerous occasions.

93.    Further, AAM noted, yet again, that the alert criteria specified for surface settlement markers (which are designated to be installed on structures such as exterior walls of buildingd, interior walls of underground vaults or surface features such as curbs) is not applicable to the flush mount markers installed below the ground surface in unstable dirt.

94.    Thus, AAM, again, requested that PB and/or NCC reconsider the use of these non-contractual monitoring devices.

95.    Finally, AAM provided notice that it will seek all costs and delays associated with this latest shutdown due to PB and/or NCC's insistence on the disputed performance criteria.  A copy of AAM's April 11, 2012 notice letter is attached hereto as Exhibit "P" and is incorporated herein by reference.

96.    To provide even further support for the fundamental problems associated with the instrumentation monitoring devices (which AAM has disputed since May 2011), AAM forwarded PB and/or NCC survey data taken from the flush mount markers during the winter

shutdown months which also show movement greater than the Level 2 Alert, although no Work was even being performed at the time. A copy of AAM's letter dated April 12, 2012 is attached hereto as Exhibit "Q" and is incorporated herein by reference.

97.     PB and/or NCC responded to AAM's notice letter on April 13, 2012 yet again completely ignoring AAM's concerns with the instrumentation monitoring devices and alert criteria.

98.     Rather, PB demanded AAM provide it with a remediation plan on how to proceed.

99.     AAM responded on April 17, 2012 stating that it was not aware of any changes that could be made to AAM's Rev 2 Excavation Plan to ensure the flush mount markers stay within the Alert criteria specified for the structure mounted surface settlement markers.

100.     AAM reiterated that it did not believe the Project was constructible within the instrumentation performance criteria PB has directed AAM to follow which was formally disputed. A copy of AAM's April 17, 2012 letter is attached hereto as Exhibit "R" and is incorporated herein by reference.

101.     During the shutdown, AAM proposed to NCC that AAM proceed with all non-critical work activities that could be started during the Project shutdown period to mitigate further Project delays that could result if such activities were put off to a later date. These activities included: testing of the completed pipe, installation of manhole inverts and roadwork where AAM had completed the pipe installation.

102.     AAM reserves all of its rights to seek all costs associated with performing this unanticipated, out-of-sequence work to mitigate the unwarranted NCC-directed Project shutdown.

103.    NCC did not respond to AAM's request to commence the mitigation work during the shutdown.

104.    Finally, on July 10, 2012, NCC, through PB, authorized AAM to resume work after approval of AAM's revisions to the Instrumentation Supplement to TRN 0121 concerning instrumentation monitoring.

105.    This owner-directed shutdown of the Project caused ninety-one (91) days of delay.

106.    Despite the foregoing nine (9) claims, **AAM remained committed to completing the Project with skill and dedication.**

### 10.    Summary Of Claims

107.    The total amount of costs incurred by AAM in performing the above-referenced Additional Work is in excess of **Four Million Two Hundred Sixty Thousand Two Hundred Twenty-One Dollars and Seventy-Five Cents ($4,260,221.75)** and the additional time AAM spent performing the Additional Work is **in excess of three hundred fifteen (315) days**.

108.    To date, despite repeated demands, NCC has failed to pay AAM the **Four Million Two Hundred Sixty Thousand Two Hundred Twenty-One Dollars and Seventy-Five Cents ($4,260,221.75.00)** for the Additional Work or grant AAM's request for **in excess of three hundred fifteen (315) additional days**.

109.    Because the Project is ongoing, the amount owed to AAM for Additional Work may increase during the course of litigation.

## COUNT I

## BREACH OF CONTRACT

110.    AAM incorporates all of the foregoing paragraphs as though fully set forth at length herein.

111.    The Contract between AAM and NCC was a valid contract.

112.    AAM has performed all of its work on the Project in a good and workmanlike manner.

113.    Furthermore, AAM fulfilled all of the conditions precedent to payment under the Contract for the Work it has performed.

114.    A balance in excess of **Four Million Two Hundred Sixty Thousand Two Hundred Twenty-One Dollars and Seventy-Five Cents ($4,260,221.75)** remains outstanding for the Additional Work that AAM performed pursuant to the Contract.

115.    To date, despite AAM's repeated requests and demands, NCC has failed and refused to pay AAM for the Additional Work.

116.    For the reasons set forth in detail above, NCC has breached the Contract.

117.    As a direct and proximate result of NCC's breach of Contract, AAM has incurred damages consisting of, *inter alia*:   additional labor and materials costs, as well as unabsorbed home office overhead expenses and the escalation of equipment costs due to NCC's delays on the Project in excess of **Four Million Two Hundred Sixty Thousand Two Hundred Twenty-One Dollars and Seventy-Five Cents ($4,260,221.75).**

WHEREFORE, Allan A. Myers, LP demands judgment against New Castle County in an amount in excess of **Four Million Two Hundred Sixty Thousand Two Hundred Twenty-One**

**Dollars and Seventy-Five Cents ($4,260,221.75),** plus interest, costs, attorneys' fees, and any other such damages this Court may deem appropriate.

## COUNT II

### *QUANTUM MERUIT*

118.     AAM incorporates all of the foregoing paragraphs as though fully set forth at length herein.

119.     NCC received the benefit and use of the labor and materials sold and furnished by AAM to NCC and services performed by AAM on the Project in accordance with the Contract.

120.     AAM is entitled to the *quantum meruit* value of the labor, materials and services provided for the benefit of NCC.

121.     AAM provided the labor, materials and services to NCC with the expectation that it would be paid for them, and NCC was provided the labor, materials and services under circumstances that put NCC on notice that it was required to pay for them.

122.     NCC appreciated or realized the benefit of the labor, materials and services conferred upon it by AAM, and the acceptance and retention of these benefits without compensating AAM would be inequitable.

123.     The *quantum meruit* value of the labor, material and services provided by AAM and for which AAM remains unpaid by NCC is an amount in excess of **Four Million Two Hundred Sixty Thousand Two Hundred Twenty-One Dollars and Seventy-Five Cents ($4,260,221.75).**

WHEREFORE, Allan A. Myers, LP demands judgment against New Castle County in an amount in excess of **Four Million Two Hundred Sixty Thousand Two Hundred Twenty-One**

Dollars and Seventy-Five Cents ($4,260,221.75), plus interest, costs, attorneys' fees, and any other such damages this Court may deem appropriate.

## COUNT III

### UNJUST ENRICHMENT

124.    AAM incorporates all of the foregoing paragraphs as though fully set forth at length herein.

125.    To the extent there is no adequate remedy at law, AAM pleads Count III in the alternative.

126.    AAM provided the labor and materials for the work, and performed services at the Project for the benefit of NCC.

127.    NCC was enriched by the labor and materials furnished to it by AAM, to the impoverishment of AAM, and there is a relationship between the enrichment and the impoverishment.

128.    There is no adequate justification for NCC to keep the benefits conferred upon it by AAM without compensating AAM.

129.    The value of the benefit conferred on NCC by AAM, which consists of the labor and materials provided by AAM and other services performed by AAM, and for which AAM remains unpaid by NCC, equals an amount in excess of **Four Million Two Hundred Sixty Thousand Two Hundred Twenty-One Dollars and Seventy-Five Cents ($4,260,221.75)**.

130.    The retention of the benefit of the labor, material and services provided by AAM to NCC without compensating AAM would be unjust.

WHEREFORE, Allan A. Myers, LP demands judgment against New Castle County in an amount in excess of **Four Million Two Hundred Sixty Thousand Two Hundred Twenty-One**

**Dollars and Seventy-Five Cents ($4,260,221.75)**, plus interest, costs, attorneys' fees, and any other such damages this Court may deem appropriate.

## COUNT IV

### DECLARATORY JUDGMENT

131.    AAM incorporates all of the foregoing paragraphs as though fully set forth at length herein.

132.    This Court is authorized to provide declaratory relief pursuant to 28 U.S.C. §2201.[1]

133.    There exists a judicable controversy concerning whether Section 10.08-8 of the Standard Specifications for Construction of the Contract contractually obligates NCC to provide AAM an extension of time.

134.    Section 10.08-8 provides in pertinent part that:

If the contractor finds it impossible to complete the work within the contract time as specified or as extended in accordance with the provisions of the specifications, he may, at any time prior to the expiration of the contract time as extended, make a written request to the Engineer for an extension of time setting forth therein the reasons which he believes will justify the granting of this request.  If the Engineer finds that the work was delayed because of conditions beyond the control and without the fault of the Contractor, he shall extend the time for completion in such amounts as the conditions justify.  The extended time for completion shall then be in full force and affect, the same as though it were the original time for completion.

135.    AAM provided PB and/or NCC with written requests for an extension of time for the Additional Work as required by Section 10.08-8.

---

[1]    In the alternative, AAM requests declaratory relief under Delaware's Declaratory Judgment Act, 10 *Del.C.* § 6501.

136.    Notwithstanding AAM's requests and despite NCC's obligations to the Contract, NCC has failed and refused, and has asserted that it is not obligated, to provide AAM with a three hundred fifteen (315) day time extension to the Contract completion date.

137.    As the direct and proximate result of NCC's failure to provide AAM the three hundred fifteen (315) day time extension related to the Additional Work, AAM has suffered, and continues to suffer, damages.

WHEREFORE, Allan A. Myers, LP respectfully requests that this Court enter an Order declaring that NCC is contractually obligated pursuant to the Contract to provide AAM an extension of the Contract completion date of three hundred fifteen (315) days.

## COUNT V

## DECLARATORY JUDGMENT

138.    AAM incorporates all of the foregoing paragraphs as though fully set forth at length herein.

139.    This Court is authorized to provide declaratory relief pursuant to 28 U.S.C. §2201.[2]

140.    There exists a judicable controversy concerning whether Specification Section 02140, 3.11(D) requires application of the "Level 1" and "Level 2" threshold values for "surface settlement markers" that are typically placed on structures above the ground surface to flush mount markers that are placed below the ground surface in dirt.

141.    The stated purpose of Specification Section 02140 – Geotechnical and Structural Monitoring Instrumentation is to "generate reliable data to be used to foresee problems of

---

[2]    In the alternative, AAM requests declaratory relief under Delaware's Declaratory Judgment Act, 10 *Del.C.* § 6501.

structure, utility, equipment, and ground movement" and to provide a written record to resolve disputes related to settlement and structural damage. A copy of Specification Section 02140 is attached hereto as Exhibit "S" and is incorporated herein by reference.

142. Section 02140, 1.01(E) identifies the monitoring instruments: cased deep benchmarks, surface settlement markers, inclinometers, tiltmeter plates, crack monitoring pins, seismographs, and open standpipe piezometers.

143. Section 02140, 1.01(E) does not include flush mount markers.

144. Section 02140, 3.11(D)(6) provides the "Level 1 Alert threshold values" for five (5) of the monitoring instruments identified in Section 02140, 1.01(E) - surface settlement markers, inclinometers, tiltmeter plates, crack monitoring pins, and seismographs.

145. The "Level 1 Alert" threshold for surface settlement markers is 0.375 inch.

146. Section 02140, 3.11(D)(7) provides the "Level 2 Upset threshold values" for five (5) of the monitoring instruments identified in Section 02140, 1.01(E) - surface settlement markers, inclinometers, tiltmeter plates, crack monitoring pins, and seismographs.

147. The "Level 2 Upset" threshold for surface settlement markers is 0.5 inch.

148. The maximum allowable displacements are considered exceeded if "they are exceeded at any location, floor, column, component, or position within any given building, structure or utility." *See* Spec. § 02140, 3.11(D)(9).

149. Surface settlement markers are markers placed on "structures." *See* Spec. §02140, 1.01(E)(2).

150. Specification Section 02140, 3.02(C) identifies the locations where surface settlement markers are to be placed; namely, "on exterior walls of buildings, interior walls of underground vaults or surface features such as curbs."

151.    Specification Section 02140, 3.05, regarding installation of surface settlement markers, further demonstrates that surface settlement markers are not installed below the ground surface in dirt.

152.    Surface settlement markers, as set forth in the specifications, are not intended to directly monitor gas pipelines outside the Project limits.

153.    Surface settlement markers are to be drilled into masonry or concrete.

154.    Because installation of the surface settlement markers requires drilling into the structure, and because drilling into gas pipelines is not permitted, surface settlement markers are not designed to directly monitor the gas pipelines.

155.    Appropriately located flush mount markers can directly monitor the gas pipelines.

156.    Specification Section 02140, 3.02(I) only requires specified horizontal monitoring where gas utilities are within five (5) feet of the planned excavated trench limits.

157.    Specification Section 02140, 1.05(B) provides that "[t]he Contractor is expected to make his own interpretations of the instrumentation data for his own purposes."

158.    Specification Section 02140, 1.05(B) also provides that "the Contractor must install, monitor and interpret data from any additional instrumentation that the Contractor deems necessary to insure the safety and serviceability of the work."

159.    On or about May 13, 2011, AAM participated in a geotechnical meeting with representatives from NCC, PB, Earth Engineering, Inc., and Heery International, Inc. A copy of the May 13, 2011 meeting minutes is attached hereto as Exhibit "T" and is incorporated herein by reference.

160.    At the meeting, AAM questioned why the specifications for monitoring nearby gas utility pipelines were not based on direct monitoring which would track movement of the pipelines themselves.

161.    PB responded that, although the installation of strain gauges on the gas pipelines was considered, the degree of previous settlement and pipe strain was unknown.

162.    PB also raised a concern that monitoring the gas pipelines directly could be misleading if the pipes were to temporarily bridge over settled soils.

163.    In addition, PB noted that the gas company did not want their gas pipelines to be scratched because they have a protective coating.

164.    PB concluded that these were the reasons why the specifications require surface settlement markers and piezometers, rather than direct monitoring of the gas pipelines.

165.    AAM reiterated its preference to expose the gas pipelines and monitor them, but NCC did not want AAM to do that.

166.    PB stated that it wanted AAM to install flush mount markers in the dirt on the northbound shoulder of the road within the earth active pressure zone between the trench and the gas pipelines every one hundred (100) feet.

167.    AAM raised concerns about settlement due to trucks and construction equipment travelers on the northbound shoulder.

168.    PB recommended coring holes in the northbound shoulder between the anticipated vehicle wheel path.

169.    After the meeting, PB insisted that AAM install the flush mount markers as described in the May 13, 2011 meeting.

170.    Although AAM disputed the location of the flush mount markers because they would not directly monitor the gas pipelines, which markers were not identified in the project specifications, AAM ultimately provided the flush mount markers in the selected locations to move the project forward.

171.    On or about July 27, 2011, AAM furnished to NCC its submittal TRN 0121 for the instrumentation and monitoring, which included the flush mount markers per PB's direction.

172.    NCC, through PB, approved this submittal on or about August 3, 2011.  A copy of the approved submittal TRN 0121 is attached hereto as Exhibit "U" and is incorporated herein by reference.

173.    In October 2011, NCC, through PB, expressed concern regarding the readings of certain flush mount markers.

174.    AAM responded that the proximity of the flush mount markers to the work zone had made them ineffective for the intended purpose of indicating ground settlement at the gas pipelines.

175.    In response to PB's concerns, AAM "soft dug" two existing test pits at Station 206 and Station 207 and learned that the materials surrounding the gas pipelines showed no signs of settlement.

176.    NCC, through PB, contended that the Level 1 and Level 2 threshold criteria for surface settlement markers applied to the flush mount markers.

177.    However, the approved submittal TRN 0121 for the instrument monitoring only specified that the Level 1 and Level 2 threshold criteria applied to the surface settlement markers, not the flush mount markers.

178.    Thus, neither the specifications nor the approved instrumentation submittal require that the Level 1 and Level 2 threshold criteria for the surface settlement markers apply to the flush mount markers.

179.    As a result of NCC, through PB, requiring that the flush mount markers be governed by the Level 1 and Level 2 threshold criteria applicable to surface settlement markers, the Project had been shut down on at least three (3) occasions due to readings on the flush mount markers exceeding the one half inch (1/2") threshold criteria in Specification Section 02140, 3.11(D)(7)(a).

180.    As of April 2012, there have been at least three (3) occasions where the flush mount markers have shown unexplained movement while the Project was either shut down or during a period when no excavation work was being performed.

181.    Importantly, despite the readings of the flush mount markers, there has been no evidence that the gas utility pipelines have actually moved more than 0.5 inch.

182.    Nevertheless, NCC, through PB, continued to insist that all work cease when the flush mount marker readings showed one half inch (1/2") of movement.

183.    These shutdowns due to flush mount marker readings have resulted in approximately two hundred thirty-four (234) days of delay to the Project.

184.    The insistence of NCC, through PB, that AAM adhere to the Level 1 and Level 2 threshold criteria for the flush mount markers has delayed and hindered AAM's ability to complete the work on the Project.

185.    In order to adhere to the Level 1 and Level 2 threshold criteria for the flush mount markers, AAM anticipates that it will have to spend approximately One Million Five Hundred Thousand Dollars ($1,500,000.00) to drive approximately three thousand six hundred (3,600)

linear feet of steel sheet piling into the ground as additional support for the length of the remaining excavation, which costs do not include the inefficiencies associated with this impact on the other construction work, in an effort to try to limit the movement reflected in the readings of the flush mount markers.

186.    The installation of the steel sheet piling is extra work not required by the Contract and will significantly increase AAM's cost to complete the work.

187.    However, there is no guarantee that all of the additional steel sheet piling will ensure that the Level 2 threshold criteria are not exceeded.

188.    NCC, through PB, has stated that it will not pay AAM for these significant additional costs for the steel sheet piling.

WHEREFORE, Allan A. Myers, LP respectfully requests that this Court enter an Order declaring that: (a) the "Level 1" and "Level 2" threshold criteria for "surface settlement markers" do not apply to flush mount markers; (b) Allan A. Myers, LP is entitled to recover all costs incurred as a result of having to comply with the "Level 1" and "Level 2" threshold criteria for the flush mount markers including, but not limited to, One Million Two Hundred Sixty-Three Thousand Two Hundred Ninety-Seven Dollars and Seven Cents ($1,263,297.07) for the sheeting piles installed, the cost of additional sheeting piles and extended general condition costs due to the delays; (c) Allan A. Myers, LP is entitled to a time extension of two hundred thirty-four (234) days for the number of days when the work on the Project was stopped due to readings of the flush mount markers exceeding the "Level 2" threshold criteria; and (d) such other and further relief as the Court deems just and appropriate.

## COUNT VI

## DECLARATORY JUDGMENT

189.   AAM incorporates all of the foregoing paragraphs as though fully set forth at length herein.

190.   This Court is authorized to provide declaratory relief pursuant to 28 U.S.C. §2201.[3]

191.   There exists a judicable controversy concerning whether the Contract requires AAM to monitor and prevent vertical movement of no more than 0.5 inch of utility gas pipelines outside the Project limits.

192.   As stated in Count V above, NCC required AAM to stop working on the Project between April 11, 2012 through July 10, 2012 as a result of the flush mount marker readings exceeding one half inch (1/2") of soil movement.

193.   On or about July 10, 2012, NCC, through PB, permitted AAM to resume work on the Project by approving submittal TRN 0174 as a supplement to the approved instrumentation and monitoring submittal TRN 0121.

194.   The approved submittal TRN 0174 eliminated the use of flush mount markers and, instead, contemplated the use of two (2) different instrumentation devices – utility monitoring points and deep settlement markers.   A true and correct copy of the approved submittal TRN 0174 is attached as Exhibit "V" and is incorporated herein by reference.

195.   The specifications do not include, or require the use of, utility monitoring points and deep settlement markers. *See* Ex. S, Spec. § 02140, 1.01(E).

---

[3]   Delaware's Declaratory Judgment Act, 10 *Del.C.* § 6501 also provides grounds for declaratory relief.

196.    The installation of these monitoring devices is extra work outside the Contract for which AAM is entitled to additional compensation.

197.    As a result, AAM has incurred and/or will incur approximately Fifty-Five Thousand Dollars ($55,000.00) for the installation of these additional monitoring devices.

198.    Whereas the flush mount markers were not located in close proximity to the gas pipelines, the utility monitoring points and deep settlement markers are located directly over and adjacent to the gas pipelines.

199.    AAM continues to dispute NCC's insistence on the application of the Level 1 and Level 2 threshold criteria of one half inch (1/2") for surface settlement markers to the new instrumentation devices.

200.    Specification Section 02140, 1.05(B) provides that "[t]he Contractor is expected to make his own interpretations of the instrumentation data for his own purposes."

201.    Specification Section 02140, 1.05(B) also provides that "the Contractor must install, monitor and interpret data from any additional instrumentation that the Contractor deems necessary to insure the safety and serviceability of the work."

202.    Surface settlement markers, as set forth in the specifications, are not intended to directly monitor gas pipelines outside the Project limits.

203.    Thus, the application of Level 1 and Level 2 threshold criteria for surface settlement markers to other instrumentation devices is not appropriate.

204.    In short, there is no provision in the specifications that requires AAM to monitor and prevent the vertical movement of more than one half inch (1/2") of nearby gas pipelines outside the Project limits. *See* Ex. S, Spec. § 02140.

205.    In fact, the only requirement regarding the monitoring of gas pipelines outside the Project limits is in Specification Section 02140, 3.02(I), which requires that AAM "provide inclinometer casing at a minimum of three (3) locations where gas utility alignments are within five (5) feet of the planned excavated trench limits." *See* Ex. S, Spec. § 02140.

206.    The inclinometer casing monitors horizontal displacement of soil. *See* Ex. S, Spec. § 02140, 1.01(E)(3).

207.    The gas utility pipelines do not come within five (5) feet of the planned excavated trench limits.

208.    On August 7, 2012, readings of the utility monitoring points and deep settlement markers reflected movement approaching one half inch (1/2") in locations where AAM was not even performing nearby pipe excavation work.

209.    In those areas, the only meaningful activities have been trucks moving equipment on the existing grade.

210.    NCC, through PB, continues to insist that all work cease when the instrumentation readings show one half inch (1/2") of movement.

211.    Such delays are not the responsibility of AAM.

212.    The continued insistence of NCC, through PB, that AAM adhere to the Level 1 and Level 2 surface settlement marker threshold criteria for the utility monitoring points and deep settlement markers delays and hinders AAM's ability to complete the work on the Project.

213.    In order to adhere to the Level 1 and Level 2 surface settlement marker threshold criteria for the utility monitoring points and deep settlement markers, AAM anticipates that it will have to spend approximately One Million Five Hundred Thousand Dollars ($1,500,000.00) to drive approximately three thousand six hundred (3,600) linear feet of steel sheet piling into the

ground as additional support for the length of the remaining excavation, which costs do not include the inefficiencies associated with this impact on the other construction work, in an effort to try to limit the movement reflected in the readings of the utility monitoring points and deep settlement markers.

214. The installation of the steel sheet piling is extra work not required by the Contract and will significantly increase AAM's cost to complete the work.

215. However, there is no guarantee that all of the additional steel sheet piling will ensure that the Level 2 threshold criteria will not be exceeded.

216. NCC, through PB, has stated that it will not pay AAM for these significant additional costs for the steel sheet piling.

WHEREFORE, Allan A. Myers, LP respectfully requests that this Court enter an Order declaring that: (a) Allan A. Myers, LP is not required to monitor and prevent vertical movement of no more than 0.5 inch of utility gas pipelines outside the Project limits; (b) the "Level 1" and "Level 2" threshold criteria for "surface settlement markers" do not apply to the utility monitoring points and deep settlement markers; (c) Allan A. Myers, LP is entitled to recover all costs incurred as a result of having to comply with the "Level 1" and "Level 2" threshold criteria for the utility monitoring points and deep settlement markers including, but not limited to, Fifty-Five Thousand Dollars ($55,000.00) for the installation of the utility monitoring points and deep settlement markers, and extended general condition costs due to any delays; (d) Allan A. Myers, LP is entitled to a time extension for the number of days the work on the Project is stopped due

to readings of the utility monitoring points and deep settlement markers exceeding the "Level 2" threshold criteria; and (e) such other and further relief as the Court deems just and appropriate.

COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN, P.C.

_____

Edward Seglias, Esquire (Bar I.D. No. 2822)
Scott T. Earle, Esquire (Bar I.D. No. 4541)
Nemours Building, Suite 1130
1007 North Orange Street
Wilmington, DE 19801
(302) 425-5089
*Attorneys for Plaintiff Allan A. Myers, LP*

DATED:      August 15, 2012

#1624906-v6 51430-0002