IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLAN A. MYERS, LP, a Pennsylvania Corporation, | No. 1:12-cv-01038-LPS |
| Plaintiff, Counterclaim Defendant, | JURY TRIAL DEMANDED |
| vs. | |
| NEW CASTLE COUNTY, a political subdivision of the State of Delaware, | |
| Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff, | |
| vs. | |
| PB Americas, Inc., a Maryland Corporation, | |
| Third-Party Defendant. | |

## THIRD-PARTY COMPLAINT

New Castle County ("the County"), by and through its undersigned counsel, hereby submits this Third-Party Complaint against PB Americas, Inc. ("PB") pursuant to Rule 14(a)(1) of the Federal Rules of Civil Procedure, and in support thereof states as follows:

### The Parties

1. The County is a political subdivision of the State of Delaware, with its principal office located at the New Castle County Government Center, 87 Reads Way, New Castle, Delaware 19720.

2. Upon information and belief, PB is a corporation formed under the laws of the State of Maryland, with its principal place of business located at 100 South Charles Street, Tower 1, 10th Floor, Baltimore, MD 21201-2727.

3. Upon information and belief, Allan A. Myers, LP ("Myers"), is a Pennsylvania

corporation, having its principal place of business located at 1805 Berks Road, Worcester, PA 19490.

### Jurisdiction and Venue

4. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this cause of action occurred within this jurisdictional district.

### The Project

6. The County has undertaken a construction project known as the Governor Printz Interceptors-Section I, No. 220612 (the "Project").

7. The Project is intended to upgrade and/or replace a stretch of sanitary sewer interceptor that comprises part of the County's expansive sanitary sewer system.

8. The Project requires the excavation of a trench (the "Trench") on Governor Printz Boulevard so that new sewer pipe can be installed.

9. Certain underground gas lines (the "Utilities") exist in the soil adjacent to the expected path of the Trench.

10. The County retained PB to perform, *inter alia*, certain design and construction management services with regard to the Project. Those design and construction management services required PB to consider the effect the Project would have on the Utilities.

### The Design Contract

11. On December 31, 2009, The County and PB entered into the Professional Services Agreement (the "Design Contract"). (See Design Contract, attached hereto as Exhibit "1.")

12. Pursuant to the Design Contract, PB agreed to, *inter alia,*:

a) "provide management and oversight of the supplemental subsurface investigations", to ensure that the "geotechnical investigation [was] carried out in accordance with the current industry practice and PB's approved geotechnical and tunneling quality manual as required by the firm's ISO 9000 certification." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.a.);

b) "plan and perform additional laboratory testing of recovered soil and rock samples . . . to verify field classifications, determine natural water contents, and[, possibly, to] determine engineering properties including shear strength, corrosivity, and deformability that may affect the installation or design of the proposed pipeline." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.b.);

c) supplement or update its geotechnical data report. (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.c.);

d) analyze subsurface soil, rock, and groundwater data and to "provide a final recommendation for the proposed interceptor alignment, including the Interstate Highway 1-495 crossing." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.d.);

e) evaluate "[t]he potential for settlement, heave, or vibration-induced damage during excavation or tunneling." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.d.);

f) evaluate "[t]he potential for post-construction settlement." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.d.);

g) evaluate "[t]he need for ground improvements and instrumentation and monitoring." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.d.);

h) prepare "[f]inal design details for bid documents." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.d.);

i) "analyze subsurface external loads for proposed manholes, structures, and tunnel shafts," which "loads [would] be analyzed for two conditions; soft ground and rock." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.e.);

j) provide to the contractor and manufacturer "[g]eotechnical design loads . . . for the structural design of the manholes, structures, and tunnel shafts." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.e.);

k) "prepare a geotechnical design memorandum for internal project team use that [would] present a summary of the subsurface conditions encountered, including the supplemental investigations, laboratory testing results, interpretations of anticipated

subsurface conditions and ground behavior, and recommendations for design and construction." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.f.);

l) prepare "[g]eotechnical specifications and quantity/cost estimates . . . based on geotechnical investigations," including "[s]pecial provisions . . . for open cut-excavations, dewatering, and ground condition instrumentation and monitoring." (See Design Contract, Exhibit A – Part 1, Section IV, Task 04.h.);

m) "refine the proposed interceptor sewer alignments based on consideration of supplemental survey and geotechnical data and the feasibility of eliminating the existing 42/48-inch sewer in Governor Printz Boulevard and increasing the trench width." (See Design Contract, Exhibit A – Part 1, Section IV, Task 06.b.);

n) "coordinate with various utility companies to review construction impacts on existing utilities." (See Design Contract, Exhibit A – Part 1, Section IV, Task 06.f.);

o) "utilize [a] buried utility survey to route the proposed interceptor sewer alignments to minimize conflicts with existing utilities." (See Design Contract, Exhibit A – Part 1, Section IV, Task 06.f.);

p) submit "[c]onstruction drawings and special provisions for utility support . . . to the appropriate utility companies for their review." (See Design Contract, Exhibit A – Part 1, Section IV, Task 06.f.);

q) utilize, where available, the County's "standard specifications and front-end documents . . . with modifications to make them project specific." (See Design Contract, Exhibit A – Part 1, Section IV, Task 07.c.);

r) "prepare the bid packages, incorporate contractor comments, and prepare addenda to the bid package." (See Design Contract, Exhibit A – Part 1, Section IV, Task 07.c.);

s) be "responsible for the professional quality, technical accuracy, timely completion, and the coordination of all designs, drawings, specifications, reports, and other services furnished by [PB] under [the Design Contract]." (See Design Contract, Section 4(b).)

13. In the Design Contract, PB "represent[ed] that its services [would] be performed in a manner consistent with the level of skill and care exercised by other members of the same profession currently practicing in the same locality under similar conditions." (See Design Contract, Section 4(i).)

14. Pursuant to the Design Contract, PB agreed to, be "liable in accordance with

4

applicable law for all damages to the County caused by [PB's] negligent performance of any of the services furnished under [the Design Contract]." (See Design Contract, Section 4(d).)

15. Moreover, PB agreed that, "without additional compensation, [it would] correct or revise any errors, omissions or other deficiencies in its designs, drawings, specifications, reports and other services and reimburse the county for costs related to, or caused by, such incorrect or defective work, including, but not limited to, replacement of incorrect or defective material and equipment, removal and reinstallation costs." (See Design Contract, Section 4(b).)

16. Pursuant to the Design Contract, PB agreed to "indemnify and hold harmless the County . . . from and against any and all actions, claims, damages, losses, expenses, and other associated costs (including, without limitation, fees and charges of attorneys and other professionals and court costs) asserted against or suffered by any such indemnified party by reason of (i) any breach by [PB] of the terms of [the Design Contract] . . . (iii) any negligent act or omission or willful misconduct on the part of [PB] . . . in connection with the performance of its obligations hereunder. (See Design Contract, Section 16(c).)

17. The Design Contract provides that, "[i]n addition to actual damages, the County may recover any incidental or consequential damages suffered as a result of [PB's] breach." (See Design Contract, Section 16(d).)

### The Construction Management Contract

18. On or about October 4, 2010, the County and PB entered into the Professional Services Agreement for Consulting Engineering Services for Sewer Consultant Governor Printz and Old Governor Printz Interceptors, Brandywine Hundred Sewer Basin, Phase I – Construction Inspection & Management Services (Governor Printz Interceptors – Section I), #06P-103 (the "Construction Management Contract"). (See Construction Management Contract, attached hereto as Exhibit "2.")

19. Pursuant to the Construction Management Contract, PB agreed to, *inter alia,*:

a) "monitor the progress of the work at times appropriate to the construction so as not to . . . allow for any work to be performed without review." (See Construction Management Contract, Scope of Work, § 2.1.a.);

b) "advise the Contractor of deviations, defects, or deficiencies observed in the work." (See Construction Management Contract, Scope of Work, § 2.1.a.);

c) "transmit to the Contractor a notice of non-conforming work (with a copy to [the County]) when it [was] the opinion of PB or [the County] that such work [did] not conform to the requirements of the contract documents or permits." (See Construction Management Contract, Scope of Work, § 2.1.a.);

d) "review all proposed changes in the work and [to] develop and submit its recommendations on resolving the proposed changes to [the County]." (See Construction Management Contract, Scope of Work, § 2.1.a.);

e) "review the Contractor's means and methods in the analysis of impacts to schedule and costs." (See Construction Management Contract, Scope of Work, § 2.1.a.);

f) assist the County "by coordinating activities of others affected by the work," including, but not limited to, "coordination with . . . state agencies, county government, Amtrak, adjacent land owners, adjacent utility owners, Contractors working in the area, technical service providers under this work order, and sub-consultants retained by PB for material inspections and testing per the specifications." (See Construction Management Contract, Scope of Work, § 2.1.e.);

g) "assist [the County] in reviewing the Contractor's Quality Control Plan for conformance to current [County] standards and the contract documents." (See Construction Management Contract, Scope of Work, § 2.2.);

h) "review the plan for adequacy and comprehensiveness in covering the project needs, and provide any comments, recommendations, or suggestions to [the County]." (See Construction Management Contract, Scope of Work, § 2.2.);

i) "assist [The County] in assuring that the performance specifications so mandated in the contract documents [were] fully captured and adhered to in the execution of all work performed by the Contractor." (See Construction Management Contract, Scope of Work, § 2.2.);

j) assist the County "by establishing an on-site Quality Assurance Plan that [was to be] based on the technical specifications and construction plans contained within the project contract documents." (See Construction Management Contract, Scope of Work, § 2.2.);

k) provide on-site monitoring of construction activities within the Contractor's

work area, including reviewing all quality control testing data performed by the Contractor during project execution. (See Construction Management Contract, Scope of Work, § 2.2.);

l) "assist [the County] in examining [Myers's] submittals for completeness and acceptability and to determine the anticipated effect on the construction budget and schedule." (See Construction Management Contract, Scope of Work, § 2.3.);

m) be "responsible for the professional quality, technical accuracy, timely completion, and the coordination of all designs, drawings, specifications, reports, and other services furnished by [PB] under [the Construction Management Contract]." (See Construction Management Contract, Section 4(b).)

20. In the Construction Management Contract, PB "represent[ed] that its services [would] be performed in a manner consistent with the level of skill and care exercised by other members of the same profession currently practicing in the same locality under similar conditions." (See Construction Management Contract, Section 4(i).)

21. Pursuant to the Construction Management Contract, PB agreed to, be "liable in accordance with applicable law for all damages to the County caused by [PB's] negligent performance of any of the services furnished under [the Construction Management Contract]." (See Construction Management Contract, Section 4(d).)

22. PB agreed that, "without additional compensation, [it would] correct or revise any error, omissions or other deficiencies in its designs, drawings, specifications, reports and other services and reimburse the County for costs related to, or caused by, such incorrect or defective work, including, but not limited to, replacement of incorrect or defective material and equipment, removal and reinstallation costs." (See Construction Management Contract, Section 4(b).)

23. Pursuant to the Construction Management Contract, PB agreed to "indemnify and hold harmless the County . . . from and against any and all actions, claims, damages, losses, expenses, and other associated costs (including, without limitation, fees and charges of attorneys and other professionals and court costs) asserted against or suffered by any such indemnified

party by reason of (i) any breach by [PB] of the terms of [the Construction Management Contract] . . . (iii) any negligent act or omission or willful misconduct on the part of [PB] . . . in connection with the performance of its obligations hereunder. (See Construction Management Contract, Section 16(c).)

24. The Construction Management Contract provides that, "[i]n addition to actual damages, the County may recover any incidental or consequential damages suffered as a result of [PB's] breach." (See Construction Management Contract, Section 16(d).)

### The Myers Lawsuit

25. On or about August 15, 2012, Myers filed suit against New Castle County.

26. Myers has alleged that PB failed to include, in the original specifications, any requirement regarding the direct measurement of soil settlement and failed to specify any stop-work threshold value related to soil settlement. (See, e.g., Myers's Complaint [Dkt. 1], ¶¶ 62-63, 78, 93. 140-156.)

27. During construction, Myers proposed using a trench box to shore the walls of the Trench.

28. PB conditionally accepted Myers's proposed use of a trench box despite the fact that PB regarded the trench box as incapable of adhering to the "accepted engineering practices" requirement.

29. In conjunction with the trench box, Myers proposed the use of flush-mounted settlement markers to directly monitor the level of soil movement caused by the excavation of the Trench.

30. However, according to Myers, there were no thresholds in its submittal regarding soil settlement against which the flush-mounted settlement markers were to be measured. (See Myers's Complaint [Dkt. 1], ¶¶ 62-63, 78, 93.)

31. According to Myers, PB approved the use of the trench box and flush-mounted settlement markers but failed to specify any stop-work threshold related to soil settlement measured by the flush-mounted settlement markers. (See, e.g., Myers's Complaint [Dkt. 1], ¶¶ 62-63, 78, 93, 140-156, 176-179.)

32. Myers further alleges that, since there are no threshold values set forth in the construction contract documents relating to flush-mounted settlement markers, it had and has no contractual obligation to meet any threshold levels, as measured by flush-mounted settlement markers. (See, e.g., Myers's Complaint [Dkt. 1], ¶¶ 62-63, 78, 93, 140-156, 176-179.)

33. Myers alleges that the need to comply with a half-inch threshold level relating to the flush-mounted settlement markers was an extra contractual obligation imposed by PB resulting in additional costs for which Myers should be compensated by the County. (See, e.g., Myers's Complaint [Dkt. 1], ¶ 69, 179, 82, 182-186.)

34. In addition, Myers also alleges that this Project is not constructible within the instrumentation performance criteria PB has allegedly imposed upon Myers.

35. Myers alleges that the Project has been suspended on several occasions because the level of soil settlement recorded by the flush-mounted settlement markers exceeded the thresholds set forth for surface settlement markers, which were erroneously applied by PB to the flush-mounted settlement markers (See Myers's Complaint [Dkt. 1], ¶¶ 60, 82, 105.)

36. Myers alleges that those shutdowns resulted from PB's extra-contractual stop-work threshold and, therefore, constitute a violation of Myers's construction contract with the County for which it should be compensated by the County. (See Myers's Complaint [Dkt. 1], ¶ 69.)

### Count I – Breach of the Design Contract

37. The County incorporates by reference the allegations set forth in the previous

Case 1:12-cv-01038-LPS   Document 26   Filed 04/05/13   Page 10 of 14 PageID #: 545

paragraphs as if more fully set forth herein.

38. For purposes of this Third-Party Complaint only and without admitting same, the County re-alleges the allegations of Plaintiff's Complaint as though pled solely against PB.

39. Pursuant to the Design Contract:

- PB must perform its contractual obligations in a manner consistent with the level of skill and care exercised by other members of the same profession under similar conditions.
- PB remains responsible for the professional quality and technical accuracy of all designs, drawings, specifications, reports and other services furnished pursuant to the applicable contracts.
- PB must cure any errors, omissions or deficiencies in its drawings, designs, specifications, reports or other services without additional compensation.
- PB must reimburse the County for all costs related to or caused by any of PB's incorrect or defective work.
- PB must reimburse the County for all costs related to or caused by any breach of contract by PB
- PB is liable for all damages to the County caused by PB's negligent performance of any of the services furnished pursuant to the contracts.
- PB agreed that the County may recover any incidental or consequential damages suffered as a result of any breach by PB of either contract.

40. According to Myers, PB's specifications were deficient and erroneous because PB failed to include specifications regarding the direct measurement of soil settlement as well as any thresholds related thereto.

41. If Myers's allegations are correct, PB breached the Design Contract and negligently failed to include specifications regarding the direct measurement of soil settlement as well as thresholds related thereto.

42. If Myers's allegations are correct, PB failed to perform its services in a manner consistent with the level of care and skill required by the Design Contract.

43. If Myers's allegations are correct, the specifications drafted by PB are deficient in

that the Project is not constructible as designed.

44. If Myers's allegations are correct, PB breached the Design Contract.

45. The County is entitled to indemnification from PB pursuant to Section 16(c) of the Design Contract.

46. The County is entitled to reimbursement from PB pursuant to Section 4(b) of the Design Contract.

47. The County is entitled to damages from PB pursuant to Section 4(d) of the Design Contract.

WHEREFORE, the County, as Third-Party Plaintiff, prays for judgment against Third-Party Defendant PB for damages, together with interest, and legal expenses, including attorneys' fees and costs incurred.

### Count II – Breach of the Construction Management Contract

48. The County incorporates by reference the allegations set forth in the previous paragraphs as if more fully set forth herein.

49. For purposes of this Third-Party Complaint only and without admitting same, the County re-alleges the allegations of Plaintiff's Complaint as though pled solely against PB.

50. Pursuant to the Construction Management Contract:

- PB must perform its contractual obligations in a manner consistent with the level of skill and care exercised by other members of the same profession under similar conditions.
- PB remains responsible for the professional quality and technical accuracy of all designs, drawings, specifications, reports and other services furnished pursuant to the applicable contracts.
- PB must cure any errors, omissions or deficiencies in its drawings, designs, specifications, reports or other services without additional compensation.
- PB must reimburse the County for all costs related to or caused by any of PB's incorrect or defective work.

- PB must reimburse the County for all costs related to or caused by any breach of contract by PB
- PB is liable for all damages to the County caused by PB's negligent performance of any of the services furnished pursuant to the contracts.
- PB agreed that the County may recover any incidental or consequential damages suffered as a result of any breach by PB of either contract.

51. According to Myers, PB's specifications are deficient and erroneous because PB approved the use of a trench box and flush-mounted settlement markers but failed to provide threshold values relating to soil settlement measured by the flush-mounted settlement markers.

52. If Myers's allegations are correct, PB breached the Construction Management Contract by approving the use of the trench box and flush-mounted settlement markers without providing threshold values for the direct measurement of soil settlement by the flush-mounted settlement markers.

53. If Myers's allegations are correct, PB breached the Construction Management Contract by improperly approving Myers's request to use a trench box to shore the walls of the Trench in violation of the requirement that it satisfy "accepted engineering practices."

54. If Myers's allegations are correct, PB breached the Construction Management Contact by improperly suspending Myers's work on the Project based on Myers's supposed breach of non-existent contractual requirements.

55. If Myers's allegations are correct, PB failed to perform its services in a manner consistent with the level of care and skill required by the Construction Management Contract.

56. If Myers's allegation is true, PB breached the Construction Management Contract.

57. The County is entitled to indemnification from PB pursuant to Section 16(c) of the Construction Management Contract.

58. The County is entitled to reimbursement from PB pursuant to Section 4(b) of the

Construction Management Contract.

59. The County is entitled to damages from PB pursuant to Section 4(d) of the Construction Management Contract.

WHEREFORE, the County, as Third-Party Plaintiff, prays for judgment against Third-Party Defendant PB for damages, together with interest, and legal expenses, including attorneys' fees and costs incurred.

### Count III – Common Law Indemnification/Contribution

60. The County incorporates by reference the allegations set forth in the previous paragraphs as if more fully set forth herein.

61. For purposes of this Third-Party Complaint only and without admitting same, the County re-alleges the allegations of Plaintiff's Complaint as though pled solely against PB.

62. The County denies that it is liable to Myers in any respect. However, in the event that the County is held liable to Myers, then the County is entitled to indemnification and or contribution from PB pursuant to common law.

WHEREFORE, the County, as Third-Party Plaintiff, prays for judgment against Third-Party Defendant PB for damages, together with interest, and legal expenses, including attorneys' fees and costs incurred.

### JURY DEMAND

The County demands a trial by jury on all counts so triable.

STRADLEY RONON STEVENS & YOUNG, LLP

Dated: April 5, 2013

By: /s/ Antranig Garibian
Antranig Garibian, Esq. (No. 4962)
1000 N. West Street, Suite 1278

                                                                       Wilmington, DE 19801
                                                                       (302) 295-3805
                                                                       agaribian@stradley.com

                                                                       *Attorneys for New Castle County*

Of Counsel:
Patrick R. Kingsley, Esquire
Benjamin E. Gordon, Esquire